[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

06-14231

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 16, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-00193-CV-RLV-4

EDWARD J. REESE,

Plaintiff-Appellant,

versus

JOSH HERBERT, in his individual capacity,
DANNY ELLIS, in his individual capacity,
JASON GEDDIE, in his individual capacity,
JOE GEDDIE, in his individual capacity,
PHILLIP STREET, in his individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 16, 2008)**

Before TJOFLAT, BLACK and EBEL[*], Circuit Judges.

_____

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

In this action for damages brought under 42 U.S.C. § 1983, Edward J. Reese alleged that officers of the Dade County, Georgia, Sheriff's Department used excessive force in arresting him, in violation of his rights under the Fourth Amendment. He also alleged that their supervisor failed adequately to train and supervise them and that he was deprived of medical treatment in violation of the Fourteenth Amendment. The district court granted the defendants summary judgment on alternative grounds: (1) no constitutional violations occurred, and (2) assuming that violations occurred, the defendants were entitled to qualified immunity from suit because the relevant case law did not clearly establish that the conduct of the defendants infringed Reese's rights under the Fourth and Fourteenth Amendments. Reese now appeals the denial of his excessive force claims. He also challenges the district court's denial of his motion for leave to amend his complaint and the court's disallowance of the affidavit of his expert witness.

I.

A.

Edward J. Reese is the owner and caretaker of an apartment complex in Trenton, Dade County, Georgia. On the evening of September 18, 2003, the Dade

2

County Sheriff's Department dispatcher called a deputy sheriff, Joseph Geddie ("Deputy Geddie"), to respond to a domestic violence call at Reese's apartment complex. The dispatcher informed Deputy Geddie that the parents of the woman involved in the reported violence were also on their way. Deputy Geddie arrived at the apartment complex first and was directed to the apartment occupied by Amanda Craig Higdon. She was there with her boyfriend, who claimed that she had assaulted him. Higdon was cooperative, and within five or so minutes, Deputy Geddie was able to arrest, handcuff, and place her in the back of his patrol car.[1] He then returned to Higdon's apartment to interview the boyfriend. Joshua Herbert, another deputy sheriff, arrived soon after and entered the apartment to assist Deputy Geddie. About six minutes later, Higdon's parents, Mac Craig and his wife, arrived at the apartment and confronted Deputy Geddie about their daughter. Deputy Geddie told the Craigs to leave the building and instructed Herbert to stay outside with them to ensure that no one else entered the apartment.

---

[1] There is a discrepancy between the time stamps in the patrol car videotapes of Deputy Geddie and Deputy Joshua Herbert. Deputy Geddie's patrol car was parked facing Higdon's apartment, and the camera picked up some of Geddie's movements there. His car's videotape indicates that he was already inside Higdon's apartment at 6:46 p.m. and that Higdon was placed in his patrol car at around 6:51 p.m. Herbert's patrol car videotape does not capture these events, but extrapolating from the time stamp of later incidents, Geddie arrived at Higdon's apartment at 7:57 p.m., and he placed her in his patrol car at 8:03 p.m. The actual time that these events occurred is of little significance; what matters is that the incident that gave rise to this law suit appears to have occurred about 15 minutes after Deputy Geddie first arrived on the scene.

3

Georgia State Trooper Jason Geddie ("Trooper Geddie") also responded to the domestic violence call as a courtesy to local law enforcement.[2] When he arrived at the apartment complex, he observed Herbert standing outside the building. Trooper Geddie judged that the situation was under control and returned to his vehicle. Soon thereafter, another deputy sheriff, Danny Ellis, arrived and parked his vehicle next to Trooper Geddie's. Trooper Geddie immediately informed Ellis that everything was under control. As they were conversing, Trooper Geddie observed Reese drive into the apartment complex parking lot and park his truck on the opposite side of Ellis's patrol car. Reese sat in his truck for a few minutes and then exited his vehicle and approached Herbert.

It is at this point that the parties' accounts of what took place diverge. Because a central issue in this appeal is the proper version of the facts to be credited for purposes of our review of the summary judgment in this case, we provide a description of both Reese's and the defendants' versions. We begin with Reese's version of the facts.

According to Reese, he was working in his office across the street from the apartment complex when he noticed that four law enforcement vehicles had parked in front of the complex. Two of the vehicles were in the parking lot, and

_____

[2] Trooper Geddie and Deputy Geddie are cousins.

4

two were blocking the street in front of the complex. Reese also saw some people standing together outside the complex, whom he later learned were Herbert, the Craigs, and his wife, Carol Reese. Reese drove over to the apartment complex, sat in his vehicle for a few minutes, then walked up to Herbert, who was talking to the Craigs. Reese waited next to his wife for a few more minutes to get Herbert's attention and then asked Herbert who was in charge. According to the affidavits of Mac Craig and Carol Reese, Reese did not seem angry or agitated at the time, but Herbert "responded [to him] in a very belligerent and hateful tone" that the Dade County Sheriff's Department was in charge.

What happened next is not in dispute. Reese asked Herbert which officer was in charge, to which Herbert replied that Deputy Geddie was in charge but was occupied. Reese then inquired whether it was necessary for all of the vehicles to remain at the scene, since Higdon was in custody and the other tenants could not get to their apartments. Herbert replied that it was necessary for the vehicles to remain and told Reese to leave "or [he would] be going to jail." Reese responded that Herbert didn't understand, that Reese was the owner of the apartment complex.

At this point, according to Reese, he turned to walk toward Trooper Geddie's vehicle. As he turned, Herbert grabbed him by the left arm, threw him

5

against the apartment building in a choke hold, and struck him. Herbert began shouting at him to stop resisting. Reese, Carol Reese, Mac Craig, and Amanda Higdon attest that Reese was not fighting back. Herbert then threw Reese to the ground, where Reese lay face down with his left arm behind his back and his right arm under his body. Herbert called for assistance, and the other defendants appeared en masse. Because his face was in the mulch, Reese was unable to see who subsequently did what. Mac Craig and Carol Reese observed Ellis place his knees on Reese's back, and then all four of the defendants piled on top of Reese, continued twisting his left arm behind his back, and commenced "kicking and punching him and yelling 'stop resisting.'"[3] At some point, Reese's left arm was handcuffed. Reese could not extract his right arm from beneath him because the defendants were on top of him. Reese repeatedly yelled that he was not resisting, that they were breaking his arm, and that they were going to cause him to have a heart attack.

Neither of the videotapes from Deputy Geddie's or Herbert's patrol cars depict Reese's physical encounter with the officers. However, the videotapes'

---

[3] Reese was about 61 years old, 6 feet tall, and weighed 185 pounds. Herbert was about 31 years old, 5 feet 7 inches tall, and weighed 240 pounds. Deputy Geddie was about 25 years old, 6 feet 3 inches tall, and weighed 270 pounds. The record does not reflect the ages and physical attributes of the other officers.

6

audio reveals the following exchange between Herbert and Reese:

> HERBERT: Joe! [Unintelligible] wrong with you old man?  Huh?
> Huh?
> REESE: What the hell are you doing?
> HERBERT: Roll over!  Stop resisting!  Stop resisting!
> REESE: Resisting?
> MALE VOICES: Roll over!  Stop resisting and roll over!  Roll him
> over!
> REESE: You make me have a heart attack, you son of a bitch,
> [unintelligible] –
> MALE VOICE: Roll him over.
> REESE: I didn't –
> MALE VOICE: Hook him up.  Stop resisting!
> REESE: I ain't resisting!
> MALE VOICE: [Unintelligible.]  Give me hand!
> REESE: I ain't resisting!
> MALE VOICE: Gimme your hand!
> REESE: You broke my arm, you rotten son of a bitch!
> MALE VOICE: Gimme your hand!
> REESE: You guys are [unintelligible] –
> MALE VOICES: Roll it over.  Roll it over.
> REESE: Stop [unintelligible].  You make me have a heart attack –
> MALE VOICES: Roll it over.  [Unintelligible.]  Stop resisting!
> REESE: I'm not resisting!  You're breaking my arm!  I'm not
> resisting!  I'm not resisting!
> MALE VOICES: Yes you are.  Let this arm back.  Let this arm come
> back.  There you go.
> REESE: I'm not resisting!  You broke my arm!  You broke my left
> arm! [Unintelligible.]  My left arm, you broke it . . . . [4]

Deputy Geddie then lifted Reese's head up by the hair and sprayed Reese in the

---

[4] The incident occurs on Deputy Geddie's videotape at approximately 7:02 p.m.
Herbert's videotape is turned on in the middle of the incident, with a time stamp of about 8:11
p.m.  According to Deputy Geddie's videotape, this entire exchange took about a minute.

face with pepper spray at very close range. Reese's right arm was then handcuffed as well. Reese can subsequently be heard protesting on the Herbert videotape: "I didn't have no fight. He jumped on me, I never said a word." The videotape audio reveals that a short time later, Mac Craig complained to Deputy Geddie about Herbert's behavior, explaining that "[Reese] just said I don't see where you need all these patrol cars on my property, and that – knocked the shit out of him, for no reason."

The defendants' version is markedly different. Herbert claims that he was standing outside with the Craigs when a visibly angry Reese walked up to him. At his deposition, Herbert claimed that the following transpired:

> [Reese] came walking up, why are all these police cars doing here. We've had a domestic call out here, everything is okay, you can go ahead and leave. I'm not leaving, I'm the landlord, and I want to know who is in charge. Sir, Corporal Geddie is in charge, he's inside. Some of the other people that were there, they started to talk about some damage inside. At that point I told everybody they could all, I said, listen, everybody, y'all need to go ahead and leave. And then the third and final time Ed Reese told me he was not leaving because he was the landlord I said he was under arrest, and I grabbed his arm.[5]

---

[5] Reese maintains that he was never told that he was under arrest before Herbert tried to grab his arm. As recorded on Herbert's patrol car videotape, the first time that Herbert recounted the incident to the other officers at the scene, he stated:

> He comes over here complaining. You all need to be here, so many cars need to be out here? I said yes sir. So that went on. And he started again with it. Who's your supervisor? I said there's a corporal inside. I appreciate your [unintelligible], you can leave now. He said I ain't leavin' or something. And he

8

As Ellis was about to leave the scene, he saw Herbert attempting to grab Reese's arm and Reese pulling his arm away. Ellis exited his vehicle and approached the pair, intending to assist. Herbert testified at his deposition:

> I grabbed his arm, and he pulled away from me. He said, don't put your hands on me, and his hand went in a fist. . . . And pulled away at the same time. . . . Once he did that I stepped in again with the grabbing to arrest him, and it ensued into a wrestling type match. He was resisting, I was trying to arrest him, we were struggling. Both of us crashed up against the window wall area [of the apartment].

Deputy Geddie heard "a big thud" on the brick wall of the apartment building and heard Herbert yelling his name for assistance. Deputy Geddie opened the front door of the apartment building and saw Herbert and Reese struggling together and then falling to the ground. Reese and Herbert fell forward, knocking Ellis over in the process. At this point the testimony of the deputies is

---

goes like this. Did you see it?

As Herbert is transporting Reese to the Dade County jail, the following exchange occured:

> REESE: I don't know why you attacked me.
> HERBERT: Why? Because you pulled away from me, Mr. Reese.
> REESE: Pulled away from you? You put your hands on me. I didn't take any – any –
> HERBERT: Mr. Reese, I told you to leave.
> . . .
> HERBERT: You should have never pulled away from me, Mr. Reese.
> REESE: You should never have attacked me. [Unintelligible] . . . settle this in court.
> HERBERT: Mr. Reese, I was escorting you away from the building.
> REESE: Yes, you broke my f—ing arm, for no reason.

9

somewhat at variance. Ellis testified that he fell on top of Herbert, who was on top of Reese, who lay face-down on the ground with either one or both arms beneath him. Herbert claims that he was not on top of Reese but was on his knees behind him. Ellis scrambled to his feet and attempted to take hold of Reese's left arm, pulling off Reese's watch in the process. Reese jerked his arm back. Ellis took hold of Reese's left arm with both hands and then felt the left arm "go sort of soft, just a muscular feeling." Sensing something was wrong, Ellis stopped pulling the arm back.

Trooper Geddie claims that he heard Reese loudly cursing – something to the effect of "I'll kill you bastards" – and refusing Herbert's repeated requests for him to get off his hand or hands so that he could be handcuffed. Believing that Herbert needed his assistance, Trooper Geddie positioned himself near Reese's head and applied a non-lethal, "soft hands" pressure point technique to Reese's neck to subdue him. Trooper Geddie stopped applying the maneuver when he realized that it was having no effect. Apart from that maneuver, Trooper Geddie claims he had no other physical contact with Reese.

Deputy Geddie then sprayed Reese in the face with one burst of pepper

spray, which enabled Herbert to handcuff Reese.[6]  Herbert retrieved Reese's watch as well as Reese's glasses, which had been knocked off during the struggle. About eight minutes later, Reese was transported to the Dade County jail in Herbert's patrol car, and about half an hour after that he was taken to Erlanger Hospital for treatment.[7]  Reese was subsequently charged with misdemeanor obstruction pursuant to O.C.G.A. § 16-10-24(a).[8]  He stood trial in the Dade County Superior Court, and the jury found him not guilty.

B.

On September 6, 2005, Reese filed this law suit against Herbert, Deputy Geddie, Ellis, and Trooper Geddie[9] in the United States District Court for the Northern District of Georgia, seeking damages against them in both their official

---

[6] Deputy Geddie testified at his deposition that Reese never got up off the ground and was never rolling around.

[7] Reese's medical expert, Dr. Robert Mastey, observed that Reese had "multiple contusions of the chest and abrasions of the lower extremities, pain in the neck and lumbar back area, a small fracture on the inside of the elbow, a chipped fracture off the triquetrous bone in the wrist, hyper extension, and internal rotation injury in that region."

[8] O.C.G.A. § 16-10-24(a) provides that "[e]xcept as otherwise provided in subsection (b) of this Code section [concerning felony obstruction], a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor."

[9] Reese also sued Phillip Street, the Dade County Sheriff, for inadequate training and supervision.  His complaint sought damages against Herbert on the additional ground that he failed to provide Reese with adequate medical treatment.  In the initial brief he filed in this appeal, Reese abandoned this claim against Herbert and all claims against Street.  We confine our discussion accordingly.

and individual capacities under 42 U.S.C. § 1983[10] for using excessive force in violation of the Fourth and Fourteenth Amendments.[11] He also asserted a number of claims under Georgia state law. On November 21, 2005, Reese filed an amended complaint that deleted his state law claims and his claims against the officers in their official capacities.

In their answers to Reese's amended complaint, the defendants denied liability and asserted as an affirmative defense that they were entitled to qualified immunity from suit. On March 10, 2006, Herbert, Deputy Geddie, and Ellis

---

[10] 42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[11] The Fourth Amendment is applicable to the state and local governments under the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961). In addition to asserting an excessive force claim under the Fourth Amendment, Reese asserts an excessive force claim under the substantive component of the Due Process Clause. Because "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than a 'substantive due process' approach," Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989), we analyze Reese's excessive force claim in the context of the Fourth Amendment only. See also Garrett v. Athens-Clarke County, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004) (quoting Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998), for the proposition that "Fourteenth Amendment analysis does not begin until after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody, and after the plaintiff has been in detention awaiting trial for a significant period of time") (internal quotation marks omitted).

jointly moved the court for summary judgment; Trooper Geddie moved for summary judgment four days later. On April 10, Reese filed a response in opposition to the defendants' motions and an accompanying brief. Attached to the brief were the affidavits of Mac Craig, Amanda Higdon, Carol Reese, and Vandiver Keller, an expert in law enforcement policies and procedures. Also on April 10, Reese moved the court for leave to file a second amended complaint containing an additional claim against Herbert for unlawful arrest.[12] The defendants objected to Reese's motion for leave to amend and moved the court to strike Keller's affidavit as untimely under Federal Rule of Civil Procedure 26(a) and Local Rule 26.2(C). They also moved the court to strike the affidavits of Mac Craig, Amanda Higdon, and Carol Reese on the ground that they constituted "shams."

On July 10, 2006, the district court entered an order denying Reese's motion for leave to amend; granting the defendants' motion to strike Keller's affidavit; denying their motion to strike the affidavits of Mac Craig, Amanda Higdon, and Carol Reese; and granting the defendants' motions for summary judgment on the ground of qualified immunity. Reese v. Herbert, No. 4:05-CV-0193-RLV, 2006

---

[12] The proposed second amended complaint also contained a claim against all defendants for failure to provide medical treatment. Reese abandoned this claim in his initial brief on appeal.

13

WL 1892026, at *19 (N.D. Ga. July 10, 2006). Reese now appeals, challenging the court's adverse rulings.

## II.

The first two issues Reese raises question the district court's denial of his motion for leave to file a second amended complaint and its disallowance of Keller's affidavit. We address these issues in turn.[13]

## A.

Reese contends that the district court abused its discretion in denying his motion for leave to file a second amended complaint, which would have added a false arrest claim against Herbert. As we have frequently observed, though leave to amend is "freely given when justice so requires," it is "not an automatic right." Fed. R. Civ. P. 15(a) (2006); Faser v. Sears, Roebuck & Co., 674 F.2d 856, 860 (11th Cir. 1982). A district court may, in the exercise of its inherent power to manage the conduct of litigation before it,[14] deny such leave where there is

---

[13] Because both of these issues are committed to the sound discretion of the district court, we review a court's denial of leave to amend and discovery rulings for abuse of discretion. Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999). Indeed, "we will only reverse a district court's denial of a motion to amend in instances in which the district court has clearly abused its discretion." Smith v. Sch. Bd., 487 F.3d 1361, 1366 (11th Cir. 2007) (per curiam) (emphasis added) (internal quotation marks and citation omitted).

[14] From the time they were established, Article III courts have had an assortment of "inherent powers," all derived from the common law. While never specified in the Constitution or legislative enactments, these powers assisted courts in exercising their

14

substantial ground for doing so, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Id. at 1319 (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962)).

The record contains ample reasons supporting the district court's ruling. The motion for leave to amend accompanied Reese's response to the defendants' motions for summary judgment and was filed nearly seven weeks after the close of discovery. Because the period for discovery had expired, granting the motion would have caused the defendants undue prejudice, as they would not have been able to conduct further discovery with respect to the claim the proposed amendment asserted. See Lowe's Home Ctrs., Inc. v. Olin Corp. 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions."). At bottom, the district court regarded Reese's motion "merely as an attempt to defeat the pending

enumerated judicial powers, such as managing their cases and courtrooms.

Byrne v. Nezhat, 261 F.3d 1075, 1131 n.110 (11th Cir. 2001).

15

summary judgment motions." Reese, 2006 WL 1892026, at *7. See also Lowe's Home Ctrs., Inc., 313 F.3d at 1315 ("It is not an abuse of discretion for a district court to deny a motion for leave to amend a complaint when such motion is designed to avoid an impending adverse summary judgment.").

Reese contends that his delay in moving for leave to amend was justified because "the need for the Second Amended Complaint became obvious only after a thorough review of the criminal trial transcript, the depositions of the parties, and consultation with Plaintiff's expert after he had the opportunity to review all of the referenced transcripts." We find this reason plainly insufficient. In Layfield v. Bill Heard Chevrolet Co., we affirmed the denial of leave to amend where the plaintiff sought to raise an issue for the first time after the defendant had moved for summary judgment, noting that "all of the facts relevant to the proposed amendment were known to the appellant at the time she filed her original complaint." 607 F.2d 1097, 1099 (5th Cir. 1979) (per curiam).[15] Similarly, in the case at hand, the evidence upon which Reese was basing his false arrest claim against Herbert was essentially known to Reese at the time he filed both his original and first amended complaints. The additional utility he may have gained

_____

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

from reviewing the transcripts of the defendants' depositions and his criminal trial and consulting his expert did not justify the delay in seeking leave to amend. We do not lightly regard "the duty of an attorney to prepare a case properly and to give the issues full consideration before preparing pleadings." Id.[16] Given the circumstances before it, the district court was well within its discretion in denying Reese's motion for leave to amend.[17]

---

[16] Lawyers of experience, who practice what we boast to be a learned profession, owe a duty both to their clients and to the court, and, perhaps, even to other members of their profession, who appear as opposing counsel, to prepare cases properly, to give the issues full consideration before preparing pleadings, and, in general, to exercise diligence in the practice of their profession. Code of Professional Responsibility DR 6-101. While a trial court may use other remedial measures, we do not consider that it was an abuse of discretion under the circumstances of this case for the trial court to deny counsel the right, after submitting the case on one set of hypotheses and learning that this was not enough, to attempt to inject new issues in the hope of achieving a different result.

Lamar v. Am. Fin. Sys. of Fulton County, Inc., 577 F.2d 953, 955 (5th Cir. 1978).

[17] We note, moreover, that the district court treated with leniency Reese's request for leave to amend. As the defendants point out, and Reese does not dispute, his motion did not comply with Local Rule 7.1(A)(2), which requires that all motions (except for certain specified motions) be filed within 30 days after the beginning of discovery, unless the prior permission of the court has been obtained. LR 7.1(A)(2), NDGa. Reese's brief in response to the defendants' opposition to his motion was also untimely; it was due on April 26, 2006, but was not filed until May 8, 2006. Nonetheless, the district court "reviewed the merits of the plaintiff's brief and found them to be unpersuasive." Reese v. Herbert, No. 4:05-CV-0193-RLV, 2006 WL 1892026, at *7 n.14 (N.D. Ga. July 10, 2006). The court was by no means obliged to overlook his violation of the local rules. See, e.g., Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979) (per curiam) ("A local rule of the district court requires that all written motions be accompanied by supporting briefs and affidavits. [Therefore], the district court could properly deny leave to amend for failure to comply with the local rule.").

17

B.

Reese claims that the district court abused its discretion in striking Keller's affidavit from the record. Reese submitted his Rule 26 initial disclosures on November 21, 2005, stating that there were no known experts at the time (other than medical experts), and stating that he would supplement his response "as soon as he retains additional experts."[18] Reese formally retained Keller on December 7, 2005. On February 9, 2006, twelve days before the close of discovery, Reese verbally informed the defendants that he had retained Keller. No expert report was provided at that time. It was not until April 10, nearly seven weeks after the expiration of the discovery period, that Reese submitted an affidavit from Keller as part of his brief in opposition to the defendants' summary judgment motions.

We find no abuse of discretion in the district court's decision to exclude

---

[18] As it was then phrased, Rule 26 required that "a party shall disclose to other parties the identity" of any expert witness to be used at trial, which disclosure must "be accompanied by a written report prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(A), (B) (2006). Such report must contain

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B).

Keller's affidavit. The court based its decision on Reese's failure to disclose Keller's identity earlier in the discovery period. Rule 26 does not prescribe a specific deadline applicable here (because a trial date had not been set), but the expert disclosure rule is intended to provide opposing parties "'reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" Sherrod v. Lingle, 223 F.3d 605, 613 (7th Cir. 2000) (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's note). In accordance with this purpose, the district court's local rule provides that:

> Any party who desires to use the testimony of an expert witness shall designate the witness sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.
> Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

LR 26.2(C), NDGa.

As a threshold matter, the February 9, 2006, revelation of Keller's name was not enough to discharge Reese's obligation under the federal and local rules. "Disclosure of expert testimony" within the meaning of the federal rule contemplates not only the identification of the expert, but also the provision of a

19

written report containing "a complete statement of all opinions" and "the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B). Furthermore, the local rules required disclosure that was "sufficiently early in the discovery period" so as to permit the defendants to depose Keller, and possibly to name a rebuttal expert "sufficiently in advance of the close of discovery" so that the expert could also be deposed during the discovery period. LR 26.2(C), NDGa. Rule 26, however, provides that the depositions of such experts "shall not be conducted until after the report is provided." Fed. R. Civ. P. 26(b)(4)(A). The disclosure of Keller's affidavit almost seven weeks after the close of discovery foreclosed the defendants' opportunity to depose Keller and to obtain an expert of their own.

As it read at the time, Rule 37(c)(1) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1) (2006). Reese's proffered excuse for the delay is that Keller could not have rendered a proper written report without first reviewing the parties' depositions, which were taken on January 26, 2006, and the transcripts from Reese's criminal trial. Reese claims that he did not receive the trial transcript until January 26 and the deposition transcripts until February 13; he also points

out that he submitted Keller's affidavit on the day it was completed. The district court found this excuse unsatisfactory for the reason that it "merely addresses why his expert was not able to produce his affidavit earlier in the discovery process," and provides no reason for the untimely identification of Keller's name.

In addition to this, we disagree with Reese's characterization of the necessity of the trial and deposition transcripts to Keller's written report. The outcome of the criminal trial, for example, was not critical to Keller's opinion. Keller could have rendered a report based upon the presentation made in the criminal trial or based upon factual assumptions furnished to him by Reese. If those assumptions subsequently turned out to be erroneous, Keller could have supplemented the report at a later time. Moreover, at a minimum, Reese could have filed a motion to extend the discovery period so as to permit a proper disclosure. He offered no excuse for failing to do so. "Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." Cooper v. S. Co., 390 F.3d 695, 728 (11th Cir. 2004), overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 457–58, 126 S. Ct. 1195, 1197–98, 163 L. Ed. 2d 1053 (2006) (citing Sherrod, 223 F.3d at 613). Here, the failure to comply with Rule 26(a) was both unjustified and

21

harmful to the defendants; thus, the district court clearly acted within its discretion

by excluding the Keller affidavit.[19]

## III.

Reese claims that the district court violated Federal Rule of Civil Procedure

83[20] because the court applied Local Rule 56.1(B)(2)[21] in a manner that is

---

[19] We observe, moreover, that pursuant to Rule 26(e)(1), a party is subject to "a continuing duty to make a seasonable supplementation to its original answers to any question asking for the identity of an expert witness expected to be called at trial, the subject matter on which the expert will testify and the substance of his testimony." Hancock v. Hobbs, 967 F.2d 462, 468 (11th Cir. 1992). The defendants indicate that Reese "never amended his initial disclosures to disclose to all parties his purported expert witness and said expert's written report."

[20] Rule 83 requires a district court's local rules to be consistent with the Federal Rules of Civil Procedure. Fed. R. Civ. P. 83(a) (2006) (authorizing federal courts to prescribe local rules "consistent with – but not duplicative of – Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075").

[21] Local Rule 56.1(B)(2) provides in pertinent part:

A respondent to a summary judgment motion shall include the following documents with the responsive brief:
a. A response to the movant's statement of undisputed facts.
(1) This response shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts.
(2) This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's facts with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).
(3) The court will deem the movant's citations supportive of its facts unless the respondent specifically informs the court to the contrary in the response.
(4) The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Fed. R.

inconsistent with Federal Rule of Civil Procedure 56 by permitting summary judgment to be entered without giving "appropriate weight" to "all the evidence in the record." He maintains that Rule 56, if properly applied, precluded the court from granting the defendants summary judgment. We now address these claims of error.[22]

## A.

Reese's primary argument with respect to the district court's application of Local Rule 56.1 is that it contravenes the standard for summary judgment set forth in Federal Rule of Civil Procedure 56.[23] The pertinent requirement of Local Rule 56.1 is that the respondent to a summary judgment motion must file a response to the movant's statement of undisputed facts which sets forth, as to each numbered

_____

Civ. P. 56(f).

[22] We "give[] great deference to a district court's interpretation of its local rules" and review a district court's application of local rules for an abuse of discretion. Quick v. Peoples Bank of Cullman County, 993 F.2d 793, 798 (11th Cir. 1993); Clark v. Housing Auth. of Alma, 971 F.2d 723, 727 (11th Cir. 1992).

We review de novo a district court's grant of summary judgment, applying the same legal standards as the district court. Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). "Summary judgment is a lethal weapon, and courts must . . . beware of overkill in its use." Brunswick Corp. v. Vineberg, 370 F.2d 605, 612 (5th Cir. 1967). Accordingly, summary judgment is only appropriate where, viewing the evidence in the light most favorable to the non-moving party, "the record before the district court shows that there is no genuine issue as to any material fact" such that the movant is entitled to judgment as a matter of law. Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007).

[23] Reese also cites Rule 1 for the well-worn statement that the federal rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1 (2006).

23

undisputed fact that the respondent is contesting, "specific citations to evidence (including page or paragraph number)" that support the respondent's version of the facts. In the absence of such specific citations to evidence, the court "will deem each of the movant's facts as admitted." LR 56.1(B)(2)(a)(2), NDGa.

Here, it is undisputed that Reese did not include specific citations to evidence in his response to the statement of undisputed facts submitted by Herbert, Deputy Geddie, and Ellis.[24] It is further undisputed that Reese failed to file any response at all to Trooper Geddie's statement of undisputed facts. Nonetheless, Reese contends that by deeming the defendants' statements of undisputed facts to be admitted, the district court improperly "discounted" or "ignored" evidence in the record that it should have fully considered in ruling on the defendants' motions – including the affidavits of Carol Reese, Mac Craig, and Amanda Higdon.

We begin our analysis by examining the local rule. Authorized by 28

---

[24] Reese's response to the Dade County defendants' statement of undisputed facts reads thus:

> Plaintiff contends that genuine issues of material fact remain to be tried by a jury in regard to material allegations of the following paragraphs: 4, 5, 6, 7, 9, 10, 11, 14, 15, 18, 21 (opinion, not fact), 22 (opinion, not fact), 23 (opinion, not fact), 29, 30 , 31, 32, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 64, 66, 70, 71, 76, 77, 78, 79, 81, 82, 85, 87, 91, 92, 93, and 98. Specific allegations of fact by Plaintiff are included in the Statement of Facts in his brief and are hereby incorporated herein by reference.

U.S.C. § 2071(a),[25] local rules generally reflect the courts' traditional "authority to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." See Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 172–73, 110 S. Ct. 482, 487–88, 107 L. Ed. 2d 480 (1989) (internal quotation marks omitted). Specifically, Local Rule 56.1 protects judicial resources by "mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge." Alsina-Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir. 2005) (referring to analogous local rule); see also Libel v. Adventure Lands of America, Inc., 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense."). The rule also streamlines the resolution of summary judgment motions by "focus[ing] the district court's attention on what is, and what is not, genuinely controverted." Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007).

The "deeming order" authorized by Local Rule 56.1 is considered to be both a sanction for the parties and a balm for the district court: the

---

[25] 28 U.S.C. § 2071(a) provides that "[t]he Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under" 28 U.S.C. § 2072. Local rules "are effective 'unless modified or abrogated by the judicial council of the relevant circuit.'" Brown v. Crawford County, 960 F.2d 1002, 1009 n.10 (11th Cir. 1992) (quoting 28 U.S.C. § 2071(c)(1)).

25

parties are given an incentive to conform to the rule (provided they wish to have their version of the facts considered), and the district court is in any case relieved of the obligation to ferret through the record.

CMI Capital Mkt. Inv., LLC v. Gonzalez-Toro, No. 06-2623, 2008 U.S. App. LEXIS 5682, at *6 n.2 (1st Cir. Mar. 18, 2008).  In upholding the exercise of courts' discretion to apply deeming orders, our sister circuits have repeatedly stressed the vital function of rules such as Local Rule 56.1, reinforcing stern admonitions with rather colorful imagery.  See, e.g., Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) ("Given the vital purpose that such rules serve, litigants ignore them at their peril."); Smith v. Lanz, 321 F.3d 680, 683 (7th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (internal quotation marks omitted).  We hold the rule in similarly high esteem.

The proper course in applying Local Rule 56.1 at the summary judgment stage is for a district court to disregard or ignore evidence relied on by the respondent – but not cited in its response to the movant's statement of undisputed facts – that yields facts contrary to those listed in the movant's statement.  That is, because the non-moving party has failed to comply with Local Rule 56.1 – the only permissible way for it to establish a genuine issue of material fact at that stage – the court has before it the functional analog of an unopposed motion for

summary judgment. Application of the deeming order does not, however, automatically entitle the movant to summary judgment. This is so because under Rule 56, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)) (emphasis added). The movant therefore continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged. That is, the movant is not "absolve[d] . . . of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001); see also Mariani-Colon, 511 F.3d at 219 n.1 (noting that the movant's "uncontested facts and other evidentiary facts of record must still show that the party is entitled to summary judgment") (internal quotation mark omitted); Alsina-Ortiz, 400 F.3d at 81 (noting that the deeming order "merely means that the district court can accept the moving party's allegedly

uncontested facts as true, but whether or not this justifies summary judgment for the moving party depends upon the legal and factual configuration that results").

Our decision in United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida, 363 F.3d 1099 (11th Cir. 2004), is instructive. In that case, we held in the context of an unopposed motion for summary judgment that "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." Id. at 1101. In describing those portions of the record that a court must review, we explained that

> [t]he district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment.

Id. at 1101–02 (citation omitted).[26] Similarly, after deeming the movant's statement of undisputed facts to be admitted pursuant to Local Rule 56.1, the district court must then review the movant's citations to the record to "determine if

---

[26] In denying the motion for summary judgment, the district court in One Piece of Real Property did not scour the entire record to locate a genuine issue of material fact. Rather, the district court found that a genuine issue was indicated by the deposition of the defendant's girlfriend, which "was attached to the government's motion for summary judgment." United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1102 (11th Cir. 2004). On appeal, we likewise "confine[d] our review of the record in [One Piece of Real Property] to the materials submitted by the United States in support of its summary judgment motion." Id. at 1102 n.4.

there is, indeed, no genuine issue of material fact." See id. at 1103 n.6. Thus

applied, Local Rule 56.1 is not in conflict with Rule 56.[27]

In the instant case, however, there are two passages in the district court's

dispositive order which give significant cause for concern. The first passage

indicates that

> the court examined the affidavits of Mac Craig and Carol Reese. In
> their affidavits, Craig and Reese state that all four of the law
> enforcement officers punched and kicked the plaintiff while all four
> of the officers were on top of him. However, on this point the court
> gave the affidavits of Craig and Reese little weight because the
> plaintiff did not properly dispute the Statement of Undisputed
> Material Facts submitted by the Dade County defendants and
> [Trooper] Geddie.

Reese, 2006 WL 1892026, at *3 n.8 (emphasis added).

The second passage concerns the defendants' objections to the affidavits of

Mac Craig, Amanda Higdon, and Carol Reese. Defendants argued that these

affidavits "should be disregarded because these individuals submitted inconsistent

---

[27] We note the existence of tension between Rule 56 and Local Rule 56.1(B)(2)(a)(3), which provides that "[t]he court will deem the movant's citations supportive of its facts unless the respondent specifically informs the court to the contrary in the response." To the extent that the local rule permits the district court to grant summary judgment without first reviewing the materials submitted with the motion to ensure that the motion is properly supported, the local rule is void by virtue of conflict with Rule 56. See One Piece of Real Prop., 363 F.3d at 1103 n.6 (discussing analogous local rule in the Southern District of Florida).

testimony at the plaintiff's criminal trial." Id. at *6.[28] Reese maintained that "these individuals' prior testimony to the extent that it is inconsistent goes to the weight of the evidence, rather than its admissibility." Id. The court "agree[d] with the plaintiff. Therefore, the court examined and used these affidavits. However, to the extent that these affidavits contradicted the sworn testimony given at [Reese's criminal] trial, the court disregarded the affidavit testimony." Id. (emphasis added).

What these passages clearly indicate is that the district court did not hew to the evidentiary line drawn by Local Rule 56.1 by focusing solely on the

---

[28] Specifically, the defendants contended that the district court should strike the affidavits of Craig, Higdon, and Carol Reese as sham affidavits under the rule of Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."); see also Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986) (construing Van T. Junkins to require inherent inconsistency in the form of clear and unambiguous deposition testimony and a subsequent affidavit that "contradicts, without explanation," such testimony); Tippens v. Celotex Corp., 805 F.2d 949, 955 (11th Cir. 1986) (Hill, J., specially concurring) ("The Lane decision drastically limits this court's holding in [Van T. Junkins]."). The district court denied the motion to strike the affidavits as complete shams, and expressly "examined and used these affidavits." Reese, 2006 WL 1892026, at *6. We further note that Craig, Higdon, and Carol Reese are not parties to this lawsuit, as we have never squarely addressed whether, and in what circumstances, a district court may disregard the affidavit of a non-party that is inherently inconsistent with deposition testimony given by the non-party previously in the same case. See Lane, 782 F.2d at 1531 ("[W]e would be unable, absent great trepidation, to affirm a similar finding [that a contradictory affidavit constitutes a sham] with respect to a disinterested witness' contradictory affidavit."). Moreover, we would be reluctant to disregard an affidavit of a witness, whether or not a party in the case, on the ground that it is inconsistent with testimony the witness gave in another proceeding.

30

defendants' record citations and disregarding the materials submitted by Reese that were contrary to the defendants' statement of undisputed facts. Put another way, the court essentially overlooked Reese's noncompliance with Local Rule 56.1 – which it had broad discretion to do – and treated the Craig, Higdon, and Reese affidavits as evidence of sufficient probative value to cross the threshold of admissibility. By opting not to deem the defendants' statement of undisputed facts as admitted, however, the court implicitly chose to base its decision on all of the evidentiary materials in the record on summary judgment. See Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) ("In opposing summary judgment, the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."); Tippens v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986) ("The District Court shall consider all evidence in the record when reviewing a motion for summary judgment – pleadings, depositions, interrogatories, affidavits, etc. – and can only grant summary judgment if everything in the record . . . demonstrates that no genuine issue of material fact exists.") (internal quotation marks omitted); Holtz, 258 F.3d at 73 (holding that "while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a

31

statement") (internal quotation marks and citations omitted).

The district court's error compounds itself at this point, for having found that the three affidavits were admissible, it was not for the district court to discount or disregard them at the summary judgment stage based on its assessment of the quality of the evidence.[29] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); Lane v. Celotex Corp., 782 F.2d 1526, 1528 (11th Cir. 1986) ("The district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to assess the probative value of the evidence.") (citation omitted). Yet this is precisely what the district court appears to have done by giving "little weight" to the affidavits of Mac Craig and Carol Reese to the extent that they "state that all four of the law enforcement officers punched and

---

[29] We do not, of course, question the district court's decision to disregard the affidavits of Craig and Carol Reese to the extent that they contained inadmissible hearsay. Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.") (internal quotation marks omitted).

32

kicked the plaintiff while all four of the officers were on top of him," and by "disregard[ing] the affidavit testimony" of Mac Craig, Amanda Higdon, and Carol Reese to the extent that such testimony was (in the court's view) contradicted by their prior testimony at Reese's criminal trial. Such credibility determinations are for the jury.

In sum, the district court erred by failing to review the full record on summary judgment and by failing to construe the facts and make all reasonable inferences and credibility choices in favor of the non-moving party. That is, "[e]ven though the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case, our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff." Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006) (internal quotation marks and citations omitted). We proceed to that analysis.

B.

Defendants are entitled to qualified immunity if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). "[Q]ualified immunity applies unless application of the standard would inevitably lead every reasonable officer [in

33

defendants' position] to conclude the force was unlawful." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993).

The facts in this case, viewed in the light most favorable to Reese, do not support the grant of qualified immunity for the defendants. Because it is undisputed that they were engaged in "discretionary functions," see Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (defining the inquiry as considering whether the official engaged in acts "of a type that fell within the employee's job responsibilities"), the burden shifted to Reese to demonstrate that (1) the defendants violated his federal constitutional or statutory rights, and that (2) those rights were clearly established at the time they acted. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002); Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002).

The first question we must decide is whether Reese's version of the facts demonstrates the use of excessive force in violation of the Fourth Amendment. Not only does "the right to make an arrest or investigatory stop necessarily carr[y] with it the right to use some degree of physical coercion or threat thereof to effect it," Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72, 104 L. Ed. 2d 443 (1989), but we also "recognize that the typical arrest involves some force and injury." Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002).

34

However, while the use of force below a de minimis threshold ordinarily will not be actionable, see Vinyard, 311 F.3d at 1348 n.13 (collecting cases), "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." Zivojinovich v. Barner, No. 07-11903, 2008 U.S. App. LEXIS 8711, at *30 (11th Cir. Apr. 23, 2008) (per curiam). Where probable cause or arguable probable cause to arrest existed, the question is not what "underlying intent or motivation" the officers harbored, Beshers v. Harrison, 495 F.3d 1260, 1266 (11th Cir. 2007), but whether the officers' actions were "objectively reasonable" in light of the facts and circumstances they faced at the time, "including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

We begin our inquiry, therefore, with the question of whether Herbert had probable cause or arguable probable cause to arrest Reese. See Lee, 284 F.3d at 1195. Under Georgia law, "[e]xcept as otherwise provided in [O.C.G.A. § 16-10-24(b)],[30] a person who knowingly and willfully obstructs or hinders any law

---

[30] O.C.G.A. § 16-10-24(b) provides that

Whoever knowingly and willfully resists, obstructs, or opposes any law

35

enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). Under Reese's version of the facts, we conclude that no reasonable officer could have believed that probable cause existed to arrest Reese for violation of O.C.G.A. § 16-10-24(a). Ten minutes had elapsed since the alleged aggressor in the domestic violence dispute had been handcuffed and placed in Deputy Geddie's patrol car. Herbert was standing outside the building to prevent others from entering the apartment where Deputy Geddie was interviewing the alleged victim. After approaching Herbert, Reese patiently waited for a few minutes before making his request that the law enforcement vehicles be moved. He then requested to speak with the officer in charge. Throughout this exchange, Reese maintained a calm voice and demeanor. Reese did not impede or hinder Herbert in the performance of his police duties. See Skop v. City of Atlanta, 485 F.3d 1130, 1138–39 (11th Cir. 2007). Though Reese may have refused to obey Herbert's order to leave the scene by attempting to approach Trooper Geddie, arrest for obstruction cannot be predicated upon such a refusal to obey "a command to clear the general area entirely beyond the zone of

---

enforcement officer . . . in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

police operation," which, in the circumstances described, was clearly "an overly broad and unreasonable demand that exceed[ed] reasonable law enforcement procedure and needs." See Woodward v. Gray, 527 S.E.2d 595, 599 (Ga. Ct. App. 2000); see also id. at 598 ("To obstruct, resist, or oppose for purpose of obstructing an officer implies forcible resistance and does not mean the refusal to merely obey the police officer's command to move . . . so that the police could perform their duties unimpeded. For speech to rise to the level of obstruction, it must be reasonably interpreted to be a threat of violence to the officer, which would amount to obstruction or hindrance.") (citations omitted); cf. Davis, 451 F.3d at 767 (applying Florida law and holding that "[n]either an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct. Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's supervisor or from asking for an officer's badge number. Those inquiries likewise do not constitute obstruction of justice or disorderly conduct.").[31]

---

[31] The defendants argue that the fact that the state trial court denied Reese's motion for a directed verdict of acquittal at the close of Reese's criminal trial for misdemeanor obstruction "constitutes a binding determination of probable cause for Plaintiff's arrest." The argument is without merit. See Bates v. Harvey, 518 F.3d 1233, 1241 (11th Cir. 2008) (finding neither Rooker-Feldman doctrine nor issue preclusion barred plaintiff from litigating probable cause issue).

37

In the absence of probable cause, Herbert was not justified in using any force against Reese. Yet as Reese turned to walk toward Trooper Geddie's vehicle, Herbert grabbed his arm, slung him against a wall in a choke hold, struck him, and then threw him to the ground. From the perspective of reasonable officers in the defendants' positions, including those who claimed they did not see or hear how Reese was arrested, the force that was subsequently used against Reese was also unreasonable. While Reese lay face down on the ground, all four defendants piled on top of him and began kicking and beating him. One or more of the defendants continued twisting his arm behind his back despite his repeated screams that they were breaking his arm. Cf. Davis, 451 F.3d at 768. Trooper Geddie then applied a pressure point technique on his neck.[32] After Reese's left arm had been handcuffed, Deputy Geddie then pepper-sprayed Reese in the face. At no point was Reese fighting back or attempting to escape; "indeed, [he] was charged with nonviolently resisting arrest." See King v. Reap, No. 06-15616,

---

[32] At this stage, we credit Reese's version of the facts over Trooper Geddie's claims that he did not have any other physical contact with Reese and that he reasonably believed some degree of force was necessary in light of his ignorance of the reason for arresting Reese and his active resistance. According to the affidavits of Mac Craig and Carol Reese, all four defendants – Trooper Geddie included – were on top of Reese, kicking and beating him. Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir. 2004) (finding that a reasonable officer could have concluded that it was necessary to put his foot on the face of a suspected shooter who had been carrying a shotgun, because the suspect had not been cooperative and could have been carrying other concealed weapons), invoked by the defendants, is thus factually distinguishable.

38

2008 U.S. App. LEXIS 5170, at *7 (11th Cir. Mar. 7, 2008) (unpublished).

The Graham factors, as applied to Reese's version of the facts, weigh decisively in Reese's favor. The crime of misdemeanor obstruction is a crime of "minor severity" for which less force is generally appropriate. See Vinyard, 311 F.3d at 1348–49. In view of the fact that Reese was lying face down on the ground, was not suspected of having committed a serious crime, did not pose an immediate threat of harm to anyone, and was not actively resisting or evading arrest, the defendants' use of force was a wholly disproportionate response to the situation. See id. at 1348 ("Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.").

It is beyond question that the law was "clearly established" so as to give the defendants fair warning that their actions in such circumstances violated Reese's Fourth Amendment rights. No particularized, preexisting case law was needed to inform them that an officer is not entitled to qualified immunity where his conduct goes "so far beyond the hazy border between excessive and acceptable force that [he knows that he is] violating the Constitution." Priester v. City of Riviera Beach, 208 F.3d 919, 926–27 (11th Cir. 2000) (internal quotation marks omitted);

see also <u>Vinyard</u>, 311 F.3d at 1350 & n.18 (collecting cases).[33]  Reese's version of the facts demonstrates a beating that "falls within 'the core of what the Fourth Amendment prohibits': a severe beating of a restrained, non-resisting suspect." <u>King</u>, 2008 U.S. App. LEXIS 5170, at *7.  Accordingly, defendants are not entitled to summary judgment on the ground of qualified immunity.

IV.

For the foregoing reasons, we affirm the denial of Reese's motion for leave to filed a second amended complaint and the disallowance of the Keller affidavit, but reverse the summary judgment granted to the defendants on the basis of qualified immunity.

AFFIRMED, in part, and REVERSED, in part.

---

[33] Even if particularized case law were necessary in this context, we have no difficulty finding that by September 2003, previous case law clearly established that officers may not use excessive force against a non-resisting suspect who has already been subdued.  See <u>Hadley v. Gutierrez</u>, No. 06-12605, 2008 U.S. App. LEXIS 9695, at *20–21 (11th Cir. May 6, 2008) (citing cases, and holding that "[a]pplying the excessive force standard would inevitably lead every reasonable officer . . . to conclude that the force used here – punching a non-resisting criminal suspect for no apparent reason other than malice – is not protected by our constitution.") (internal quotation marks omitted).