[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-10169
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-02510-MLB


SAMUEL R. HAYES, III,

Plaintiff-Counter Defendant-Appellant,

versus

ATL HAWKS, LLC,
JASON PARKER,

Defendants-Counter Claimants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 4, 2021)

Before BRANCH, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

Samuel Hayes appeals the district court's grant of summary judgment in favor of his former employer, ATL Hawks, and his former supervisor, Jason Parker, in his employment action asserting claims of discrimination based on race and retaliation under 42 U.S.C. § 1981. Hayes also appeals the district court's order striking some of his summary judgment-related filings for failing to follow the district court's local rules. We affirm.

## I.     Background

Hayes began working for ATL Hawks in August 2016 as a Security Manager. He was hired by Jason Parker, the Vice President of Customer Service and Operations. Hayes was responsible for physical security and managing the security officers who worked in Philips Arena.

### A.     Complaints About Hayes's Behavior

One month into Hayes's employment, Parker began receiving complaints about Hayes from other employees, specifically that he was rude, intimidating, and "dismissive or aggressive" towards other employees or security personnel employed by the artists performing in Philips Arena. On each occasion, Hayes received a verbal reprimand and one of his supervisors met with him to discuss his behavior. During a meeting on October 17, 2016, Hayes alleges that Parker told him that people perceive him as aggressive because he is "a large black man with

2

an intimidating voice and commanding presence," and Parker advised Hayes to be mindful of his tone.[1]

On November 1, 2016, Parker and Tony Donato, the Vice President of Human Resources, met with Hayes because Parker and Donato had received more than 18 complaints about Hayes from other employees, and they had a lengthy conversation with Hayes about Hayes's rude and aggressive interactions with other co-workers raised in the complaints.  On November 6, Parker learned that Hayes tried to bring a ticketed guest to a show through a loading dock and without following proper protocols.  Parker investigated and confirmed that the allegation was true.  Parker also learned on November 6 that there was a rumor circulating that Hayes "vowed" to keep a security coordinator and the security systems manager from conversing with or directing staff because Hayes believed the two were racists.  The security systems manager asked to be moved to another position because working with Hayes caused her extreme stress.

On November 8, 2016, Parker e-mailed Hayes a final written warning.  The e-mail was a "follow up" to Hayes's conversation with Parker and Donato, and "serve[d] as a final written warning regarding systemic performance issues stemming from repeated conflicts with colleagues, partners and clients both internal and external."  The e-mail listed multiple issues raised by Hayes's

---

[1]  Parker testified that he did not "believe [he] ever used the phrase 'large black man.'"

behavior: "disrespectful confrontation," "questioning of others in an unprofessional manner, including tone, choice of words, and being dismissive," behaving "in a condescending tone towards others," and "refusal to accept ownership for [his] role in creating conflicts." The e-mail also advised Hayes that Parker and Donato expected to see immediate and substantial change in Hayes's daily interactions, including being respectful and professional in interactions with colleagues and being mindful of tone and approach.

In December 2016, Hayes invited his girlfriend to attend a show at Philips Arena and advised her to park in a secured lot. When an employee denied her access to that lot, Hayes confronted that employee over the phone. The employee sent an e-mail documenting the incident to a supervisor. After this incident, Parker and Donato met with the newly-hired Human Resources Manager, Tabala Dixon, to discuss whether to terminate Hayes's employment. Dixon advised Donato and Parker to refrain from terminating Hayes at that time and volunteered to mentor and coach Hayes.[2] Hayes met with Dixon almost daily, and, according to Parker, became an engaged, positive employee for about four to six weeks while Dixon was counseling him. In their near-daily conversations, Dixon and Hayes went over the human resources process for documenting incidents with any employees and

---

[2] Hayes claims that he did not meet with Dixon to improve his management skills because he did not need help with those skills, but claims he sought Dixon's advice because he genuinely liked her.

4

engaging in "progressive disciplinary process" before terminating anyone.  During the four to six weeks that Hayes was meeting with Dixon, Parker praised Hayes's performance.

In late March 2017, seven months into Hayes's employment, Hayes saw Kimberley Height, an employee, "yelling on the loading dock because she was upset about [Hayes] requesting" that she write a narrative of an incident that had occurred the week before.  Hayes told Height to go home and wait for human resources to contact her with next steps.  For two weeks, Hayes did not tell anyone in human resources that he had sent Height home and did not communicate with Height.  In early April, Hayes told Parker that he had suspended Height and told her to remain home until human resources contacted her.  Once Dixon learned of the suspension, ATL Hawks reinstated Height and paid her for the time she was out.

On April 12, 2017, Hayes terminated Danny Womack, a full-time employee, for sleeping on the job.  Again, Hayes did not notify or consult human resources. ATL Hawks rescinded Hayes's termination decision because Womack had known medical issues and was taking medication that may have led to him sleeping on the job.

Hayes's position as a security manager gave him the authority to hire and fire subordinates.  However, Dixon (or someone else from human resources) still

5

had to authorize the termination of full-time employees, and during their daily conversations, Dixon had told Hayes that he needed to discuss disciplinary actions or termination with human resources to ensure proper documentation.  Parker also had multiple conversations with Hayes throughout his employment to remind him to adhere to the appropriate human resources process when disciplining or terminating employees.  Hayes testified that he remembered Dixon explaining to him that he needed to discuss terminations with her to ensure proper documentation, but also that he interpreted that explanation to mean that he did not need her prior permission to terminate employees.

**B.      Hayes's Complaints About Disparate Application of Security Protocols**

When Hayes began working for ATL Hawks, it had adopted internal standard security operating procedures for Philips Arena.  Almost every artist that performed at Philips Arena asked for security procedure exemptions, such as bypassing the metal detectors and wand search.  A security liaison would work with the artist to arrange a security plan, and any request for security procedure exemptions would be escalated up to Brett Stefansson, the General Manager of the Arena, who made the ultimate decision about whether to grant the request.  The security plan for an event was then e-mailed out as a "security advance," but changes could be made to the advance up until and during the event.  Hayes was

6

not a part of conversations determining whether security concessions were granted and only heard about some decisions secondhand.

In September 2016, one month into his employment, Hayes told Parker that the security staff was "complaining about different security protocols for white and black performers at Philips Arena." According to Hayes, white artists were often allowed to bypass security procedures, while the procedures were enforced rigorously against black artists.[3] Parker and Hayes met in October 2016 to discuss Hayes's concerns, and Hayes claims Parker said that certain shows attract "gang members and criminals," and that "white acts make more money and they charge higher ticket prices, so the people who come to those shows are not going to act out."

Hayes alleges that he had two other conversations about disparate enforcement of security protocols with Parker: one in February 2017, and one on April 24, 2017, shortly before Hayes's termination. During these conversations, Hayes testified that he raised the same concerns—his staff was complaining to him about racially disparate enforcement of the security protocols with regard to

---

[3] Hayes testified that he saw multiple white performers being allowed to bypass security protocols and multiple black performers being required to adhere to security protocols. Some of the black performers requested security concessions, like bypassing metal detectors, and those concessions were denied, but Hayes did not know whether those performers complained about going through the metal detectors.

performers—and that Parker provided a similar explanation about concerns associated with specific demographics.

On the other hand, Parker testified that he could only recall one conversation with Hayes about disparate enforcement of security protocols. According to Parker, he told Hayes that he did not believe that security protocols were being disparately enforced and explained that artists seeking concessions could make a request and that the General Manager would decide whether to grant it.

Hayes also complained about disparate enforcement to Dixon.[4] Dixon told Hayes to provide Parker with specific examples of artists being treated differently based on race. According to Parker, Hayes did not do so.

On or around April 3, 2017,[5] Hayes told Nzinga Shaw, the head of Diversity and Inclusion for ATL Hawks, that he felt he was being targeted for termination specifically by Parker due to his complaints about security procedures being enforced differently on the basis of race. Hayes alleges that Shaw said she would raise the issue in an executive meeting the following week. Shaw recalled speaking with Hayes, and she e-mailed Stefansson to let him know that Hayes claimed to be experiencing difficulties with Parker.

---

[4] Dixon could not recall when this conversation took place but explained that it was sometime between when she began working for ATL Hawks in December 2016 and Hayes's termination in April 2017.

[5] Hayes e-mailed Shaw to arrange a time to talk on April 3, but Shaw was travelling for a conference and could not recall whether they spoke on April 3 or a few days later.

8

Later in April, Hayes told Donato that he felt he was being targeted for termination due to his complaints, and again raised disparate application of security protocols in a group meeting. During the group meeting, Hayes claims that Barry Henson, the Vice President of Operations, commented that "white entertainers make more money" and "Tim McGraw is not going to blow up the building." Henson did not recall Hayes ever stating that security policies were enforced differently based on race.

On April 25 or 26, 2017, Hayes told Stefansson that he felt that Parker was targeting him because of his complaints about discrimination and that Parker would likely use the Height incident as a justification to terminate him. Hayes alleged that Stefannson told him that the Height incident was not a big deal and not to worry about it and that he liked the direction security was going.

### C.    Hayes's Termination

During the week of April 20, 2017, Parker, Stefansson, and Donato exchanged e-mails discussing the "Security Transition," that they were moving forward with Hayes's termination for a variety of reasons, and that there had been continued complaints after the November 2016 final written warning that Hayes received after he tried to bring a guest into the arena through the loading dock without following security protocols. Parker recommended terminating Hayes, and Donato and Dixon agreed with the decision. Hayes was terminated on April 28,

9

2017. Hayes thought he recalled Parker telling him that he was terminated for the Height and Womack incidents. Parker told Stefansson that the Height and Womack incidents and Hayes's inability to abide by the requirements of the final written warning were the reasons for the termination.

## D.    Procedural History

On July 3, 2017, Hayes sued ATL Hawks and Parker alleging that he was unlawfully terminated on the basis of his race and in retaliation for his complaints about the racially disparate application of security protocols in violation of 42 U.S.C. § 1981(a). After discovery, the defendants moved for summary judgment on all of Hayes's claims, alleging that they fired him for behavioral issues and failure to follow ATL Hawks protocols that were ongoing after Hayes received the November 2016 final written warning.

In response, Hayes filed a brief opposing the summary judgment motion, along with three documents related to purported factual disputes: (1) Plaintiff's Objections and Responses to Defendants' Statement of Undisputed Material Facts; (2) Plaintiff's Statement of Additional Material Facts; and (3) Plaintiff's Amended Statement of Additional Material Facts. A magistrate judge reviewed the summary judgment briefing and struck portions of all three of Hayes's fact-related filings because they were not concise and did not comply with the district court's Local

10

Rule 56.1(B)[6] and impermissibly sought to incorporate arguments by reference.

The magistrate judge gave Hayes leave to amend his filings but required that he

limit his objections to the defendants' statement of material facts to 35 pages and

his statement of additional facts to 15 pages. Hayes filed new fact-related

documents but failed to comply with the court's page limitations, and these

documents were also struck. Hayes then filed a third version of these fact-related

documents, and the parties completed briefing on the issues raised in ATL

Hawks's motion.

In the Report & Recommendation ("R&R"), the magistrate judge struck

Hayes's Third Amended Statement of Additional Material Facts and Amended

---

[6] Local Rule 56.1(B)(1)–(2) provides that:

(1) A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.
(2) A respondent to a summary judgment motion shall include the following documents with the responsive brief:
(a) A response to the movant's statement of undisputed facts.
(1) This response shall contain individually numbered, concise, nonargumentative responses corresponding to each of the movant's numbered undisputed material facts.
(2) This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1B(1).

11

Objections and Responses to Defendant's Statement of Undisputed Material Facts because, again, neither filing complied with Local Rule 56.1.  The magistrate judge explained that Hayes did not organize his evidence and frequently "cite[d] his own responses to unrelated facts or his Third Amended Statement of Additional Material Facts."  Hayes also did not explain exactly which facts he was disputing, but on multiple occasions responded by writing "Disputed" followed by a string of citations without an explanation.

The magistrate judge recommended that the district court grant the defendants' motion for summary judgment on both claims.  On the discrimination claim, the magistrate judge found that Hayes had not submitted direct evidence of discrimination as the evidence in the record required unsupported inferences to establish discriminatory intent.  She also found that Hayes could not establish circumstantial evidence of discrimination under the *McDonnell Douglas* framework because he had not identified a comparator.  Finally, she found that Hayes could not establish circumstantial evidence of discrimination by presenting a "convincing mosaic" of evidence because the stray comments he offered as evidence were insufficient to infer a causal connection between the statements and the decision to fire Hayes, and because Hayes had failed to establish pretext.  The magistrate judge also recommended that the district court grant summary judgment against Hayes on his retaliation claim because he had not submitted sufficient

12

evidence that he had engaged in a protected activity, as he did not prove that the security protocols were a "contract-related right" that was a part of the artists' contracts to perform at Philips Arena.

The district court adopted the magistrate judge's recommendations and granted summary judgment in favor of Parker and ATL Hawks. It also affirmed the magistrate judge's decision to strike Hayes's responses as noncompliant with Local Rule 56.1. This appeal followed.

## II.    Standard of Review

We review a district court's order granting summary judgment *de novo*, "viewing all the evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine dispute as to any material fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(a). Under this standard, an inference based on speculation and conjecture is not reasonable, *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013), and a "mere scintilla of evidence" supporting the non-moving party's

position will not suffice to defeat a grant of summary judgment, *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).

We review a district court's application of a local rule for abuse of discretion, giving "great deference to a district court's interpretation of its local rules." *Reese v. Herbert*, 527 F.3d 1253, 1267 n.22 (11th Cir. 2008) (quotation omitted). Under this standard, we will affirm "unless the district court has made a 'clear error of judgment' or applied an 'incorrect legal standard.'" *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004) (quotation omitted).

## III.    Discussion

### A.    Hayes's Racial Discrimination Claim

Hayes challenges the district court's holding that he did not present a convincing mosaic of circumstantial evidence from which a reasonable jury could infer intentional discrimination sufficient to survive summary judgment.

> Section 1981 provides a federal remedy for racial discrimination that occurs in private employment. *See* 42 U.S.C. § 1981; *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60 (1975). It is well-established that [i]n order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in [his] favor. One way that [he] can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*. When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his]

14

employer treated "similarly situated" employees outside her class more favorably.  If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that [he] has been the victim of intentional discrimination.

*Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*).  A plaintiff may demonstrate his *prima facie* case with direct evidence or circumstantial evidence.  *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (quotation omitted).

Here, the district court found that because Hayes failed to identify a similarly situated comparator, he could not establish a *prima facie* case under *McDonnell Douglas*.  Hayes does not contest this finding on appeal.  Rather, he maintains that, notwithstanding the fact that he failed to identify a comparator, the district court erred in determining that he did not otherwise present a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination sufficient to survive summary judgment.[7]

---

[7] On appeal and before the district court, Hayes asserts that he has established a *prima facie* case of discrimination under the "convincing mosaic approach."  We note that the term "'convincing mosaic' is not a legal test."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016).  The phrase "was designed as a metaphor to illustrate why courts should not try to differentiate between direct and indirect evidence."  *Id.*; *see also Smith*, 644 F.3d 1321, 1328 (explaining that a plaintiff may establish discrimination by presenting direct or circumstantial evidence).

We have held that "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*). Thus, where a plaintiff does not establish all of the elements of the *McDonnell Douglas* framework, he can still survive summary judgment "if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Id.* (ellipsis in original) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). A convincing mosaic of circumstantial evidence "may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, [and] (3) that the employer's justification is pretextual." *Id.* (ellipsis in original) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)).

"[A] plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies." *Id.* at 1186.

16

Hayes argues that he established a *prima facie* intentional discrimination claim because he presented a convincing mosaic of circumstantial evidence from which a reasonable jury could infer intentional discrimination as articulated in *Lewis*. In support of this contention, he presents a scattershot of arguments. Specifically, Hayes contends a jury could infer intentional discrimination from the following evidence:[8] (1) all the adverse actions that befell Hayes were of suspicious timing because each adverse action occurred shortly after he "questioned, gave a directive to, or opposed a white person";[9] (2) Hayes was praised for his performance shortly before his termination; (3) Hayes was fired one

---

[8] We note that Hayes makes broad allegations but fails to provide record cites and supporting authority. While we are not required to scour the record on behalf of an appellant, we address Hayes's arguments as we best understand them.

Hayes also argues that ATL Hawks had a pattern of ignoring or trivializing racial issues. As best we can tell, Hayes relies on this argument as a part of his pretext argument. He makes this allegation in passing and does not specify the record evidence that supports his assertion or cite to supporting authority, so we deem it abandoned. See *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (explaining that a party abandons a claim when he fails to adequately brief it). To the extent Hayes offers this argument as a part of a convincing mosaic of circumstantial evidence that establishes a reasonable inference of discrimination, he does not provide sufficient evidence or explain how a jury could reach such an inference.

[9] The only adverse action Hayes raised in his race discrimination claim in his complaint was his termination. It is unclear what other adverse actions Hayes means as he did not raise these arguments below. To the extent he is referring to other instances of disciplinary action taken against him during his tenure, we will not consider these other adverse actions because they are raised for the first time on appeal. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1308 n.2 (11th Cir. 2007) ("We do not ordinarily consider arguments raised for the first time on appeal.") (citation omitted).

17

business day before he started reporting to a new supervisor, who was also black;[10]

and (4) that Parker harbored discriminatory animus towards black people.[11]

Hayes also asserts that he has demonstrated that ATL Hawks's stated reason

for his termination—that Hayes failed to follow ATL Hawks's policy in

suspending or terminating employees—is not worthy of belief and is pretextual

because (1) no such policy was in the Employee Handbook; (2) he was not told

that he was violating company policy by disciplining or firing employees without

consulting human resources until the day before he was fired; (3) testimony

established that as a manager he had the authority to discipline and fire employees;

and (4) ATL Hawks has presented shifting reasons for his termination as evidenced

by the testimony of various defense witnesses that Hayes was fired because of

continued complaints about him and performance issues.

We find that Hayes did not present sufficient circumstantial evidence to

establish a *prima facie* case of racial discrimination.  Although Hayes contends that

the timing of his April 28, 2017 termination was suspicious because it occurred

---

[10]  Hayes also raises this argument that the suspicious timing of his firing, the day before he reported to new supervisor George Turner, is a part of his convincing mosaic.  We also will not consider this argument since it was not raised below.  *Baldwin*, 480 F.3d at 1308 n.2.

[11]  As evidence of Parker's discriminatory animus, Hayes offers: (1) Parker's statement to Hayes that he was viewed as "aggressive" because he was black and his direction to Hayes to "watch his tone"; (2) other employees' belief that Parker was racist; (3) Parker's implication "that an all-black security staff could reasonably be perceived as 'less than capable'"; and (4) that Parker applied tighter security protocols for black artists than for white artists and made "derogatory stereotypes about black people.

18

shortly after he complained about disparate enforcement of security protocols on April 19, it was not. Assuming that Hayes did raise concerns during the meeting, the timing is still not sufficient to infer that he was terminated due to his race because of the fact that he had continuously complained about the alleged disparate enforcement of security protocols based on race since the beginning of his employment in August 2016. Furthermore, while Hayes's termination may have been in close proximity to his complaints about the security protocols, it was also in close proximity to the Height and Womack incidents (the Height incident occurred in late March 2017 and the Womack incident on April 12, 2017), which are the failure to follow policy incidents for which the ATL Hawks assert he was terminated.[12]

The scattered comments from Parker about race that Hayes offers and "other bits and pieces"—namely the alleged justifications of disparate security protocols based on racial stereotypes—are similarly insufficient to establish a *prima facie* case. While Parker told Hayes that others found him intimidating because they perceive him as "a large, black man with an intimidating voice and commanding

---

[12] Hayes raises another timing-related argument—Stefansson praised Hayes's performance days before Hayes was terminated. Hayes cites to no authority supporting his argument that Stefansson's passing "great job" comment to Hayes a few days before Hayes was terminated means Hayes was terminated based on his race, and so we decline to make that rule in this case. Additionally, given the close proximity of the Height and Womack incidents—the proffered reasons for Hayes's termination—we decline to infer that this incident is related to Hayes's termination.

presence,"[13] Parker made this statement during a meeting with Hayes in October 2016 over six months before Hayes's termination.  Thus, Parker's comments are insufficient to infer that it is more likely than not that Hayes's termination in April 2017 was due to his race.  *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1322–23 & n.10 (11th Cir. 1998) (concluding that racial statements allegedly made by employee's supervisor were insufficient circumstantial evidence to establish a *prima facie* case of discrimination because they were not associated with events leading to the employee's discharge).  Similarly, even assuming as Hayes contends, that the alleged racially disparate enforcement of security protocols on various artists who performed at Philips Arena demonstrates a general racially discriminatory attitude toward black artists, it does not permit a reasonable inference that Hayes's employment was terminated based on race.  The two actions are not related and simply have nothing to do with one another.

Even if Hayes had a *prima facie* case, he has failed to show that the decision to fire him for not adhering to human resources protocols was pretextual.  The evidence shows (and no one disputes) that as a manager Hayes had the authority to hire and fire subordinates.  But, although Hayes had that authority, ATL Hawks contend that he was supposed to consult human resources before taking action.  In

---

[13]  Since this case is at the summary judgment stage, we assume this allegation is true. Parker does not recall ever describing Hayes this way, but Hayes testifies that Parker said this or similar phrases to describe him multiple times.

an effort to establish pretext, Hayes argues that the ATL Hawks failed to articulate

clearly the policy that required him to notify human resources before taking

disciplinary action or firing an employee because it was not set out in the employee

handbook.[14]  In essence, Hayes is arguing that an employee may only be fired for

violating a policy written in an employee handbook.  Hayes, however, provides no

legal support for this argument and we decline to adopt such a requirement.  More

importantly, Hayes testified that he never received, saw, or had access to the

employee handbook and instead relied on the verbal policies and directives given

to him, so it is unclear how policies articulated, or for that matter not articulated, in

the employee handbook can help Hayes given that he never saw the handbook and

therefore did not know what policies were detailed in it.  Accordingly, the fact that

the policy was not in the employee handbook does not establish that the ATL

Hawks's proffered reason is pretextual and that the real reason Hayes was

terminated was because of his race.

---

[14] During the proceedings below, the ATL Hawks produced an excerpt of the employee handbook which set forth, as part of the company's progressive discipline scheme, a series of "corrective actions" that could be taken if an employee was found to be violating any rule, policy, procedure, written contract, or for failing to satisfactorily perform the employee's job. These corrective actions included verbal counseling, written counseling, a final written warning, being placed on a performance improvement plan, suspension, and termination.  Notably, the handbook provided that, if a manager believed a final written warning was warranted as an initial corrective action, the manager should contact human resources to discuss the matter before taking action, but no such similar language was included in the brief sections discussing suspension and termination.

Hayes also contends that the ATL Hawks's stated reason for his termination is pretextual because no one told him specifically that he needed human resources' approval before terminating employees until the day before he was fired when he received an e-mail regarding the Womack incident. As an initial matter, Hayes's contention that he was unaware of the policy is undermined by the record. For instance, although Hayes testified that no one explicitly told him that he needed human resources' approval before terminating or suspending employees, he also testified that he had been told that documentation was needed in order to terminate full-time employees and that he had to fill out certain forms and send them to human resources as part of the termination process. When asked to clarify whether Hayes believed he could independently make a termination decision, Hayes acknowledged that, prior to Dixon's arrival as human resources manager, Donato "wanted to see the write-ups," before any corrective action was taken but Hayes believed that Donato was only screening the write-ups for grammatical or spelling errors. He also acknowledged that when he was considering terminating an employee named Darriel, Dixon asked Hayes to discuss the reasons with her before the termination, although Hayes thought this meeting was just a formality to ensure they had the "right documentation for [him] to make the decision." Thus, Hayes's own testimony reveals that he understood that human resources was to be involved in termination decisions, even if he subjectively believed that termination decisions

22

were his alone to make as the security manager and human resources was only involved to ensure the company had the right documentation. Hayes's acknowledgement that human resources was to be involved at least on some rudimentary level is consistent with the testimony presented by numerous ATL Hawks witnesses that Hayes received multiple *verbal* instructions that he must notify human resources before taking disciplinary action. And it is undisputed that Hayes did not involve human resources at all in his suspension and termination decisions regarding Height and Womack, which was a violation of policy—even the policy as contemplated by Hayes—and it is this violation of policy that the ATL Hawks's proffered as the reason for Hayes's termination. But even if Hayes was unaware of the policy in question, that does not establish or permit a reasonable inference that the real reason he was terminated was because of his race.[15]

---

[15] Hayes also makes a number of arguments as to how he did not in fact violate any alleged policies, but this argument misapprehends the focus of the inquiry in employment cases such as this one. As our precedent makes clear, when assessing whether an employer has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether the employer in good faith believed that the employee had done so. As we have stated before when a similar argument was made by an employee against whom an adverse action was taken,

> [t]he inquiry . . . centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. . . . The question is whether [the] employers were dissatisfied with [the employee] for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those [reasons] as cover for discriminating against her. . . .

Finally, Hayes asserts that the proffered reason for his termination is pretextual because ATL Hawks has proffered shifting reasons for his termination given the extensive testimony concerning Hayes's other behavioral issues.  But this contention is also undermined by the record.  Although many of the defense witnesses testified as part of their depositions as to other behavioral issues that occurred during Hayes's employment, they also consistently stated that what ultimately led to Hayes's termination was the Height and Womack incidents.  Thus, Hayes's allegation is belied by the record, and does not provide a basis for a reasonable jury to infer that the real reason Hayes was terminated was because of his race.

Because we agree with the district court that Hayes failed to proffer a convincing mosaic of circumstantial evidence from which a reasonable jury could infer intentional discrimination, we conclude that the district court properly granted summary judgment on Hayes's race discrimination claim.

---

In analyzing issues like this one, "we must be careful not to allow [§ 1981] plaintiffs simply to litigate whether they are, in fact, good employees."

*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1252, 1266 (11th Cir. 2010) (internal citations omitted) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("The role of this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments.  Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.  Whether [the plaintiff's] conduct was insubordinate is not an issue for this Court to referee." (quotations and citations omitted)).

### B.    Hayes's Retaliation Claim

Hayes also appeals the district court's dismissal of his retaliation claim, arguing that he pleaded sufficient information to survive summary judgment when he alleged that he engaged in a protected activity by complaining about race-based security policies for Philips Arena performers, and that § 1981 applies because these security policies are contained in contractual agreements.

Section 1981 prohibits employers from retaliating against employees who have complained about the race-based violation of another person's "contract related rights." *See Bryant v. Jones*, 575 F.3d 1281, 1309 (11th Cir. 2009) ("[I]t is well-established in this circuit that claims for retaliation are cognizable pursuant to § 1981."); *CBOCS W., Inc.*, 553 U.S. at 452–57 (holding that retaliation claims under § 1981 include claims by an individual who suffers as a result of trying to help other coworkers suffering direct racial discrimination). To establish a retaliation claim under § 1981, a plaintiff must prove that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was some causal relation between the two events. *Goldsmith*, 513 F.3d at 1276 (citing *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 59–70 (2006)).

A plaintiff engages in a statutorily protected activity when he asserts a right encompassed by § 1981. *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311

25

(11th Cir. 2010).  Section 1981 provides, among other things, that all persons regardless of their race have the same right "to make and enforce contracts." 42 U.S.C. § 1981(a).  "Make and enforce contracts" for purposes of § 1981 is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

Hayes argued that his complaints concerning the security protocols were a statutorily protected activity because he was asserting the contractual rights of black artists to make and enjoy contracts with ATL Hawks for performances at Philips Arena, but he has not presented any evidence that the security plans for each show were negotiated as a part of the artists' contracts.  Rather, according to Hayes, the security plans for each show were based on ATL Hawks's internal, standard operating procedures.  Since Hayes has not proved that the security concessions were negotiated by the artists as a part of their performance contracts, he has failed to establish that he engaged in a statutorily protected activity that involved the assertion of rights encompassed by § 1981.[16]  Thus, he cannot establish a retaliation claim for purposes of § 1981.  *Jimenez*, 596 F.3d at 1311

---

[16] Hayes argues that it was reasonable for him to assume that he was engaging in a protected activity because "a reasonable person would construe the . . . bypass and the other security concessions afforded to white artists as privileges of the contractual relationship."  This argument does not affect whether § 1981 applied to the security measures because his perception does not make the measures a part of a contract.  While the artists did have contracts for

26

## C.    The District Court's Local Rule 56.1 Ruling

Finally, Hayes appeals the district court's decision to strike his Objections and Responses to Defendants' Statement of Undisputed Material Facts and his Second Amended Objections and Responses to Defendant's Statement of Undisputed Material Facts.  He maintains that his responses had to be lengthy to prove his "convincing mosaic" claim, that his responses were explanatory rather than argumentative, and that the magistrate judge imposed a "post hoc" page limitation that caused deficiencies in his filing.[17]

The United States District Court for the Northern District of Georgia's Local Rule 56.1(B) directs a respondent to a motion for summary judgment to submit a response that contains individually numbered, concise, non-argumentative responses corresponding to each of the moving party's enumerated material facts. N.D. Ga. R. 56.1(B)(2).  If the responding party does not directly refute a material fact set forth in the moving party's statement of material facts with specific citations to evidence or otherwise fails to state a valid objection to the material

---

performances, the security plans for an event were worked out with a security liaison and were fluid, often changing just before or during an event.

[17]  Although ATL Hawks contend that Hayes waived this claim by not properly briefing it or including supporting arguments, we disagree.  It is true that Hayes improperly attempts to incorporate by reference his arguments from district court filings, but because he devotes a section of his brief to the claim, he has not waived the issue. *See Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 530 (11th Cir. 2013) ("To adequately raise a claim or issue, a party 'must plainly and prominently so indicate,' for instance by 'devoting a discrete section of his argument to' those claims." (alteration adopted and quotation omitted)).

fact, the fact is deemed admitted. *Id.*; *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009). The rule is not a mere technicality; rather, it helps the court identify and organize the issues in the case. *Id.* at 1303.

The district court did not abuse its discretion by striking Hayes's filings. The magistrate judge had authority to impose a page limit on Hayes's responses. *See* Fed. R. Civ. P. 83(b). And the district court did not make a clear error of judgment when it reviewed Hayes's 125-page response to the defendants' 15-page Statement of Undisputed Material Facts and found that Hayes's response was not concise and that many of his responses contained "rambling arguments based on his interpretation of the evidence rather than concise, nonargumentative responses and specific citations to evidence" in violation of Local Rule 56.1. The district court explained how Hayes's response argued legal conclusions instead of responding succinctly to facts and noted that his Statement of Additional Material Facts and Second Amended Statement of Additional Material Facts were similarly problematic. As the district court correctly pointed out, even if it wished to do so, "it would be nearly impossible to divine [Hayes's] intentions from his cross-references," and that the point of Local Rule 56.1 was to prevent situations like this one where judges had to "hunt and peck for the relevant undisputed facts." Because we find that the district court correctly applied Local Rule 56.1, it did not

28

make a clear error of judgment or abuse its discretion.  *See Reese*, 527 F.3d at 1267

n.22, 1268.

For these reasons, we affirm.

**AFFIRMED.**